# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JEFFREY L. DAVIS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10cv00080 |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| Commissioner of Social Security, | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Jeffrey L. Davis, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq*. (West 2003 & West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Davis protectively filed his applications for DIB and SSI on March 7, 2007, alleging disability as of January 15, 2007, due to sleep apnea, high blood pressure, depression, alcoholism, obesity, pain in the ankles and feet, a hernia and concentration problems. (Record, ("R."), at 169-70, 189, 194, 212, 1118-23.) The claims were denied initially and on reconsideration. (R. at 151-53, 157, 159-60, 1113-15.) Davis then requested a hearing before an administrative law judge, ("ALJ"). (R. at 161.) A hearing was held on January 22, 2009, at which Davis was represented by counsel. (R. at 1177-1221.)

By decision dated February 17, 2009, the ALJ denied Davis's claims. (R. at 126-42.) The ALJ found that Davis met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2008. (R. at 129.) The ALJ also found that Davis had not engaged in substantial gainful activity since January 15, 2007, the alleged onset date. (R. at 129.) The ALJ determined that the medical evidence established that Davis had severe impairments, namely a major depressive disorder, alcohol dependence, polysubstance dependence, diabetes mellitus, asthma, sleep apnea and morbid obesity, but she found that if Davis stopped the substance use, his impairments would not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix
-2-
Case 2:10-cv-00080-JPJ-PMS   Document 24   Filed 03/19/12   Page 2 of 20   Pageid#: 1312

1. (R. at 129, 136.) The ALJ also found that, if Davis stopped the substance use, he would have the residual functional capacity to perform simple, noncomplex medium[1] work that did not require climbing ladders, working at heights, working around dangerous machinery or working around the public; that required only occasional crouching, crawling and stooping; and which allowed him to work in a clean environment. (R. at 138.) The ALJ found that, if Davis stopped the substance use, he would be able to perform his past relevant work as a dishwasher, a fast food cook and a newspaper inserter. (R. at 140.) Thus, the ALJ found that Davis's substance use disorders was a contributing factor material to the determination of disability, and that, if Davis stopped the substance use, he would not be under a disability as defined under the Act and would not eligible for benefits. (R. at 141.) *See* 20 C.F.R. §§ 404.1520(f), 404.1535, 416.920(f), 416.935 (2011).

After the ALJ issued her decision, Davis pursued his administrative appeals, (R. at 65), but the Appeals Council denied his request for review. (R. at 7-11.) Davis then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2011). The case is before this court on Davis's motion for summary judgment filed May 25, 2011, and the Commissioner's motion for summary judgment filed August 24, 2011.

## *II. Facts*

Davis was born in 1962, (R. at 169, 1118), which, at the time of the ALJ's

---

[1] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2011).

decision, classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Davis obtained his general equivalency development, ("GED"), diploma and has past relevant work as a fast food cook, a dishwasher, a furniture mover, a paper inserter and a lumber stacker. (R. at 195, 200, 1184-85.) Davis testified at his hearing that he had been tested regularly for drug and alcohol use since October 21, 2008, and had no positive results. (R. at 1183.) He testified that he last smoked marijuana "a little over three months" ago. (R. at 1199.) Davis stated that he felt better physically and emotionally since he stopped consuming alcohol. (R. at 1204.) He stated that he had more energy. (R. at 1204.) Davis stated that he had not attempted to find work because his lawyer's secretary told him that he "couldn't work while I was filing for my disability." (R. at 1204-05.) Davis stated that his medicine seemed to be helping him since he was taking it on a regular basis. (R. at 1207.)

Ann Marie Cash, a vocational expert, was present and testified at Davis's hearing. (R. at 1212-20.) Cash was asked to assume a hypothetical individual of Davis's age, education and work experience who had the residual functional capacity to perform simple, noncomplex medium work, who could not climb ladders, who could not work at heights or around dangerous machinery, who could occasionally crouch, crawl and stoop, who had a moderate reduction in concentration, who could not work around the general public and who would need to work in a clean environment. (R. at 1213.) Cash stated that such an individual could perform Davis's past work as a cook, a dishwasher and a newspaper inserter. (R. at 1213.) She stated that Davis's past work as cook and a dishwasher were

-4-

Case 2:10-cv-00080-JPJ-PMS   Document 24   Filed 03/19/12   Page 4 of 20   Pageid#: 1314

medium work and the job as a newspaper inserter was light work.² (R. at 1214.) Cash was asked to consider the same individual, but who was limited as indicated in the assessment completed by Dr. Joseph F. Smith, M.D. (R. at 1107-11, 1215.) She stated that Dr. Smith's assessment was "somewhat" inconsistent. (R. at 1215.) Cash stated that an individual, who was limited as indicated in the assessment completed by Catherine Parker, F.N.P., would not be able to perform substantial gainful activity. (R. at 682-83, 1219-20.)

In rendering her decision, the ALJ reviewed records from Carilion Roanoke Memorial Hospital; Rescue Mission Health Care Center; Joseph I. Leizer, Ph.D., a state agency psychologist; Dr. Shirish Shahane, M.D., a state agency physician; Dr. Robert McGuffin, M.D., a state agency physician; Richard J. Milan Jr., Ph.D., a state agency psychologist; Blue Ridge Behavioral Healthcare; and New Horizons Health Care. Davis's attorney also submitted medical records from Carilion Roanoke Memorial Hospital to the Appeals Council.³

The record shows that Davis was treated at Rescue Mission Health Care Center, ("Rescue Mission"), from January 2003 through June 2008 for various ailments such as sleep apnea; hypertension; obesity; musculoskeletal pain; poison oak; allergic rhinitis; tobacco use disorder; right foot pain; depression; chronic

---

² Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2011).

³ Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 7-11), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

-5-

alcoholism; chronic bronchitis; and peripheral neuropathy. (R. at 316-400, 682-799.) On June 25, 2008, Catherine Parker, F.N.P, a family nurse practitioner, completed an assessment indicating that Davis could occasionally lift and carry items weighing up to five pounds. (R. at 682-83.) She stated that Davis could stand and/or walk for a total of less than one hour. (R. at 682.) Parker reported that Davis's ability to sit was not affected. (R. at 682.) She reported that he should never climb, stoop, kneel, balance, crouch or crawl. (R. at 683.) Parker reported that Davis's ability to reach, to handle, to push and to pull was affected and that he could not work around heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity or vibration. (R. at 683.) Parker stated that Davis's work-related abilities were limited by his obesity, hypertension, shortness of breath and diabetes. (R. at 682-83.) Parker did not state what, if any, effect Davis's alcohol and substance abuse problems had on his work-related abilities.

The record shows that Davis was seen at Blue Ridge Behavioral Healthcare from April 2006 through January 2009 for hypertension, abdominal pain, major depressive disorder, alcohol dependence and abuse and substance-induced mood disorder. (R. at 498-662, 1001-83, 1107-12.) These records show that Davis showed a decrease in depressive symptoms and improved mood. (R. at 528-32, 534-36, 632, 635, 639, 661.) It was reported that Davis's condition was stabilized on psychotropic medication. (R. at 660-61.) On January 12, 2000, Dr. Joseph F. Smith, M.D., stated that he saw Davis on eight occasions from March 23, 2007, through January 14, 2009. (R. at 1107.) Dr. Smith reported that Davis had an unlimited or a very good ability to a limited, but satisfactory, ability to perform unskilled, semi-skilled and skilled work. (R. at 1109-10.) He reported that Davis had a seriously limited, but not precluded, ability to travel in unfamiliar places. (R.

-6-

at 1110.) Dr. Smith reported that Davis could miss more than four days of work a month due to his impairment and that his impairment had lasted or could be expected to last at least 12 months. (R. at 1111.) Dr. Smith did not state what, if any, effect Davis's alcohol and substance abuse problems had on his work-related abilities.

The record shows that Davis was admitted to Carilion Roanoke Memorial Hospital, ("Carilion"), on numerous occasions due to suicidal attempts from February 2007 through July 2009. (R. at 16-62, 67-122, 286-315, 402-21, 452-71, 663-73, 800-56, 934-57, 966-73, 1084-1104, 1135-38, 1156-69.) On February 7, 2007, after being admitted on a temporary detention order, Davis reported that he had a lot of stressors and had experienced depression "on and off for about 20 years." (R. at 292.) He reported an increased use of alcohol, stating that he consumed up to 20 beers a day and also used marijuana and crack cocaine. (R. at 292.) His discharge diagnoses were alcohol dependence; depression, possibly related to alcohol use; a substance induced mood disorder was ruled out; and cocaine abuse. (R. at 286.) On May 11, 2007, Davis was found unresponsive at a bus station by police officers. (R. at 402-05, 411-15.) He admitted to binge drinking every other week for the previous 10 to 15 years. (R. at 402.) He was admitted for treatment of dehydration as a result of alcohol intoxication. (R. at 403.) Davis admitted that he was consuming alcohol in an attempt to hurt himself. (R. at 403.) His discharge diagnoses were recurrent, severe major depression without psychosis; alcohol dependence; cocaine and cannabis abuse; and mixed personality traits. (R. at 416.) On July 19, 2007, a pulmonary function test was performed and found to be normal. (R. at 439-44.) On August 13, 2007, Davis was admitted for intentional drug overdose. (R. at 452-71.) He reported that he had

been turned down for disability, so he was planning to find a job. (R. at 470.) His concentration, attention, short- and long-term memory, fund of knowledge, language and strength all were normal. (R. at 470.)

On March 11, 2008, Davis was admitted to Carilion for alcohol dependence, major depressive disorder and borderline personality disorder. (R. at 663-73.) Davis admitted to consuming 16 beers a day, as well as wine. (R. at 669.) He was discharged with diagnoses of alcohol dependence; substance-induced mood disorder; major depressive disorder was ruled out; and possible borderline personality traits. (R. at 663.) On May 6, 2008, Davis complained of dizziness/lightheadedness. (R. at 986-1000.) A CT scan of his head was unremarkable. (R. at 994.) He was diagnosed with lethargy, probably secondary to a combination of factors; hypokalemia; marijuana use; and alcohol use. (R. at 1000.) On May 13, 2008, Davis complained of heaches, dizziness and weakness. (R. at 974-85.) He admitted to alcohol consumption that morning. (R. at 974.) A CT scan of Davis's head was unremarkable. (R. at 985.) On May 14, 2008, Davis complained of "suicidal feelings." (R. at 966-73.) He stated that he consumed 100 ounces of beer before 3 p.m. and had taken eight Trazadone. (R. at 970.) He was diagnosed with depression, not otherwise specified; suicidal ideations; alcohol abuse; and alcohol intoxication. (R. at 973.) He also was diagnosed with obesity, sleep apnea and migraines. (R. at 982.) On May 29, 2008, Davis complained of dizziness/lightheadedness. (R. at 958-65.) He was diagnosed with dehydration and alcohol abuse. (R. at 965.) On May 31, 2008, Davis reported that he was suicidal and that he had consumed alcohol earlier in the day. (R. at 950-57.) He was diagnosed with alcoholism with acute alcohol intoxication, suicidal ideation and subacute abdominal pain, etiology unclear. (R. at 957.)

On June 20, 2008, Davis reported that he had been suicidal for a couple of days. (R. at 941-50.) A CT scan of his head was negative. (R. at 949.) On July 14, 2008, Davis was admitted for an intentional overdose attempt. (R. at 934-40, 1101-04, 1135-38.) On July 16, 2008, Davis reported depressive symptoms and a serious intent to end his life. (R. at 1097-1100.) He denied alcohol and drug use for several months. (R. at 1098.) On July 18, 2008, Davis was admitted for intentional drug overdose. (R. at 800-30.) He reported that he had stopped taking his medications one month prior to admission. (R. at 801.) He was diagnosed with recurrent, severe major depressive disorder and polysubstance abuse. (R. at 800.) On August 3, 2008, Davis reported that he used cocaine and marijuana twice weekly and consumed alcohol several days a week. (R. at 832.) He was diagnosed with recurrent, severe major depressive disorder without psychotic features; alcohol dependence; nicotine dependence; and marijuana and cocaine dependence. (R. at 832.) It was noted that compliance was a problem for Davis. (R. at 880.) On August 11, 2008, Davis reported that his depressive symptoms were worsening. (R. at 1131.) He was diagnosed with major depressive disorder; polysubstance abuse; being a sexual offender; and borderline personality disorder. (R. at 1133.) On August 12, 2008, an ultrasound of Davis's abdomen showed increased liver echogenicity, possibly related to fatty liver disease. (R. at 1130.) On November 19, 2008, Davis reported suicidal thoughts. (R. at 1084-96.) It was noted that he was noncompliant with medication. (R. at 1084.)

On May 27, 2009, Davis was admitted to Carilion for an overdose. (R. at 16-62, 67-121.) Davis reported that he ingested 100 pills of 1000 mg metformin. (R. at 29.) He reported no specific recent events, but reported that he felt depressed. (R. at 29.) Davis reported that his alcoholism had been in remission for three months.

(R. at 29.) He reported that he smoked marijuana on a weekly basis and had a history of cocaine use. (R. at 72.) It was reported that Davis subsequently became ill with a metabolic acidosis and required hemodialysis and mechanical ventilation for life support. (R. at 28-29, 75.) On June 23, 2009, Davis's then-current Global Assessment of Functioning score, ("GAF"),[4] was assessed at 45,[5] with his highest GAF score being 50 in the past year. (R. at 94-97.) On June 30, 2009, it was reported that Davis's concentration and attention were mostly intact. (R. at 83-86.) His short- and long-term memory, fund of knowledge and language were normal. (R. at 84.) Psychomotor activity and gait were normal. (R. at 84.) Davis's insight was fair, and his judgment was good. (R. at 84.) He was diagnosed with recurrent, severe major depressive disorder, and his then-current GAF score was assessed at 37.[6] (R. at 86.) On July 6, 2009, Davis's GAF score was assessed at 35. (R. at 79.)

On July 5, 2007, Joseph I. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Davis suffered from an affective disorder and substance addiction disorder. (R. at 422-35.) Leizer indicated that Davis had mild restrictions of activities of daily living. (R. at 432.) He reported that Davis had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 432.)

---

[4] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[5] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

[6] A GAF score of 31-40 indicates that the individual has "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood ...." DSM-IV at 32.

-10-

Leizer also indicated that Davis had experienced one or two episodes of decompensation of extended duration. (R. at 432.)

That same day, Leizer also completed a mental assessment indicating that Davis had moderate limitations in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to set realistic goals or make plans independently of others. (R. at 436-38.) Leizer reported that Davis was markedly limited in his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to accept instructions and respond appropriately to criticism from supervisors. (R. at 436-37.) Leizer noted that Davis's disability allegations were fully credible; however, he found that alcohol was a material factor. (R. at 438.) He noted that if Davis were to remain abstinent, he would be able to perform the mental demands of simple, unskilled and nonstressful work. (R. at 438.)

On August 2, 2007, Dr. Shirish Shahane, M.D., a state agency physician, reported that Davis had the residual functional capacity to perform medium work. (R. at 445-51.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 447-48.)

On October 3, 2007, Dr. Robert McGuffin, M.D., a state agency physician, reported that Davis had the residual functional capacity to perform medium work. (R. at 472-78.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 474-75.)

On October 4, 2007, Richard J. Milan Jr., Ph.D., a state agency psychologist, completed a mental assessment indicating that Davis had a moderately limited ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to set realistic goals or make plans independently of others. (R. at 479-81.) Milan reported that Davis had a markedly limited ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 479-80.) Milan noted that Davis was markedly impaired in being able to sustain a competitive work pace, an acceptable level of job attendance or to interact with others in a socially appropriate and predictable manner. (R. at 481.) He noted that Davis's disability allegations were fully credible; however, he noted that "the claimant's alcohol dependence is material to this allowance" and if he were to remain abstinent, he would be able to perform the mental demands of simple, unskilled and nonstressful work. (R. at 481.)

-12-

That same day, Milan also completed a PRTF indicating that Davis suffered from an affective disorder and substance addiction disorder. (R. at 482-97.) Milan opined that Davis had mild restrictions of activities of daily living. (R. at 492.) He reported that Davis had moderate difficulties in maintaining social functioning and was markedly limited in his ability to maintain concentration, persistence or pace. (R. at 492.) Milan also indicated that Davis had experienced one or two episodes of decompensation of extended duration. (R. at 492.)

On February 3, 2010, Dr. Harry Brooks, D.O., completed a mental assessment indicating that Davis had a seriously limited, but not precluded, ability to follow work rules, to relate to co-workers, to interact with supervisors, to function independently, to maintain attention/concentration, to understand, remember and carry out complex instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 13-14.) He also reported that Davis had no useful ability to deal with the public, to use judgment and to deal with work stresses. (R. at 13.) Dr. Brooks found that Davis had a more than satisfactory ability to understand, remember and carry out simple instructions. (R. at 14.) He also found that Davis had a limited, but satisfactory, ability to understand, remember and carry out detailed instructions. (R. at 14.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).

-13-

This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003, West 2011 & Supp. 2011); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

If alcoholism or drug addiction is a contributing factor material to the determination of disability, a claimant may not be considered disabled. *See* 42 U.S.C.A. § 423(d)(2)(C), 1382c(a)(3)(J) (West 2003, West 2011 & Supp. 2011); *Mitchell v. CSS,* 182 F.3d 272, 274 n.2 (4th Cir. 1999). Alcoholism or substance abuse is "material" if the claimant would not be disabled if he stopped abusing alcohol or drugs. *See* 20 C.F.R. §§ 404.1535(b), 416.935(b) (2011).

Davis argues that the ALJ erred by failing to give controlling weight to his treating sources, Dr. Smith and Parker. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 11-17.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if she sufficiently explains her rationale and if the record supports her findings.

In this case, the ALJ found that, Davis was disabled because his impairments, including his substance use disorders, met the criteria of Listings

-15-

12.04[7] and 12.09.[8] (R. at 134.) The record contains voluminous evidence of Davis's long history of heavy alcohol consumption, drug use and failure to comply with medications preceding numerous hospitalizations for suicide attempts. Nearly all of Davis's hospitalizations and medication overdoses were precipitated by either Davis drinking heavily and using illegal drugs and/or his noncompliance with medication. Davis's drug and alcohol abuse led him to having suicidal thoughts and overdosing on medication. (R. at 16-62, 67-122, 286-315, 402-21, 452-71, 663-73, 800-56, 934-57, 966-73, 1084-1104, 1135-38, 1156-69.) Once hospitalized and detoxified, Davis's depression improved, and he no longer had suicidal thoughts. (R. at 417, 464, 470, 520, 531-32, 587, 665, 1032.) At his hearing, Davis testified that he felt better physically and emotionally since he stopped consuming alcohol. (R. at 1204.) He also testified that his medication was helping him since he was taking it on a regular basis. (R. at 1207.) "If a symptom

---

[7]To meet the requirements of § 12.04, a claimant must show medically documented persistence, either continuous or intermittent, of four enumerated symptoms of a depressive syndrome, which result in at least two of the following: (1) Marked restriction of activities of daily living; (2) Marked difficulties in maintaining social functioning; (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(A)(1), 12.04(B) (2011). The record shows that when abusing substances, Davis had marked difficulty in social functioning and maintaining concentration, persistence or pace and one or two episodes of decompensation. (R. at 134-35.) While abusing substances, Davis met the criteria of Listing 12.04.

[8] To qualify as disabled under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.09, a claimant must suffer from behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system and which result in meeting a listed impairment for organic mental disorders under §12.02, depressive syndrome under § 12.04, anxiety disorder under § 12.06, personality disorder under §12.08, peripheral neuropathy under §11.14, liver damage under section § 5.05, gastritis under § 5.00, pancreatitis under § 5.08 or seizure disorder under §11.02 or § 11.03. There is no dispute but that Davis suffers from a long-standing addiction to alcohol and that he has continued to consume alcohol against his physicians' advice.

-16-

can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Davis argues that the ALJ erred by failing to accord proper weight to the opinions of Dr. Smith and Parker. (Plaintiff's Brief at 11-17.) After a review of the evidence of record, I find Davis's argument unpersuasive. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's decision to not give controlling weight to the opinions of Dr. Smith and Parker. The ALJ rejected Dr. Smith's assessment because it was inconsistent with the remaining portion of his opinion. (R. at 140.) As noted by the vocational expert, Dr. Smith's opinion that Davis would be absent from work more than four days per month due to his impairment was vocationally inconsistent with his assessment that Davis had a satisfactory ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. (R. at 140, 1215.) In light of this inconsistency, the ALJ appropriately gave Dr. Smith's opinion significant weight, except for his finding about Davis being absent for

more than four days per month. (R. at 140.)

The ALJ also gave appropriate weight to the opinion of nurse practitioner Parker. (R. at 139-40.) The ALJ noted that Parker was not an acceptable medical source pursuant to the Commissioner's regulations. *See* 20 C.F.R. §§ 404.1513, 416.913 (2011). The ALJ also noted that Parker provided insufficient records to document her conclusions and that Davis was still actively abusing substances at the time she offered her opinion. (R. at 139-40.)

Furthermore, neither Parker or Dr. Smith expressed any opinion as to what effect Davis's substance abuse has had on his disability. The state agency psychologists agreed that Davis would not be disabled if he stopped abusing substances. For these reasons, I find that the ALJ properly rejected Parker's opinion.

Furthermore, the record indicates that Davis felt capable of working and even sought employment, but was worried he would not obtain social security benefits were he to get a job. In August 2007, Davis told a Rescue Mission staff member that he feared getting "too well" because it could impact his ability to obtain social security disability benefits and Medicaid. (R. at 692.) He questioned whether he should pursue looking for work or await a decision on his disability application. (R. at 508.) In February 2008, Davis wanted to get a job, but he was worried about his social security disability application and did not want to "mess up getting it by working." (R. at 654.) Davis testified at his hearing that he had not attempted to find work because his lawyer's secretary told him that he "couldn't work while I was filing for my disability." (R. at 1204-05.)

Based on my review of the record, and for the above-stated reasons, I find that substantial evidence exists in the record to support the ALJ's findings as to Davis's residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the Commissioner's weighing of the medical evidence;

2. Substantial evidence exists to support the Commissioner's residual functional capacity finding; and

3. Substantial evidence exists to support the Commissioner's finding that, absent substance use, Davis was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Davis's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: March 19, 2012.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE